Good morning. James Ruhm on behalf of Appellants John and Denise Saldano. May it please the Court. Basically this is a case over a very serious injury suffered by John Saldano. He was paralyzed as a result of basically a trap on the road in Yosemite National Park. Basically the situation is such that, and the paper said for it, that as Mr. Saldano was driving the road that he was on, he simply could not see around a turn, came around the turn, found a van, stopped, swerved into the other lane and got into an accident. We brought a number of claims obviously based on this alleging negligent maintenance and negligent design of the road. As to the negligent maintenance, it's clear under the decision in the ARA Leisure case that there's no discretion for the government to maintain the road in a safe condition. What's the evidence of the failure to maintain? Well, I think the evidence, well, we've alleged that there was basically vines hanging down and that this reduced the sight distance around the turn. Is this a motion to dismiss or a summary judgment? A summary judgment. What evidence was put forward about any vegetation or vines at the time of the accident? There wasn't any evidence, Your Honor, put forward, but there wasn't any evidence put forward that the vines didn't cause the accident. Basically the defense submitted in their summary judgment the testimony of Mr. Saldano saying that he couldn't see because there was a rock wall. There's no evidence, there's no limiting question, was there any vines, was there anything else that blocked your view? There's no evidence they've submitted whatsoever saying that there was no such thing there. There also was the expert testimony saying that a number of years later, to be honest, there was vines blocking the view. Now, I submit on that that they simply haven't met their burden. What was the speed limit on that? Now, this is a road that follows the Merced River. That's correct. And it winds around as the river does, so it's a curvy road. What was the speed limit? The speed limit was 35 miles an hour, Your Honor. And I think that's where the problem arises, is that the speed limit was simply too high. When you're looking at defective design, which is the main claim that we set forth in our complaint, basically it's subject to they're claiming that this is subject to discretionary immunity. First and foremost, I think that it fails on the first prong, because there is standards set forth that specifically say that a road with this site distance simply has to have a slower speed. The standards set forth in the parks road standards set forth that with the turn radius and the site distance, that it's simply insufficient for a 35-mile-an-hour speed limit. Was there any evidence about the car that was stopped on the road that apparently to make a left-hand turn into a tourist attraction along the road, was there any evidence about whether he was the driver of the car in front of the stopped car was blinking a turn indicator or anything? There was no evidence in the record of that that I saw, Your Honor. But I think that the issue is that it simply comes down to the matter that in this situation, when the issue is safety, this is not the type of decision that's subject to discretionary immunity. Now, let me ask, is posting appropriate speed limits part of maintenance? I would say it's more a part of design, but it also could be maintenance. In the way that the speed limit basically maintains the road, it basically – you know, really, I think it's more design, as I'm thinking about it, Your Honor. I think the speed limit is simply a matter of safety. There's no public policy in favor of having an unsafe speed. The unsafe speed is basically the cause of this accident. The testimony of our expert was that if the speed limit would have been 20 or 25 miles an hour, Mr. Saldana would have had sufficient time to stop. In this area, where there's a blind turb, where the sight distance is insufficient to stop, there's no countervailing public policy argument. Well, you said it's mandated. It is mandated. Can you cite in the record where it's mandated? What are you relying on? I'm citing to the park road standards, which are set forth in the – as part of the record. And it's put forward by our expert in his declaration, Mr. Shields. He sets forth that the minimum – Stick with my question. Cite me to the record. I want to make sure we're looking at the same thing. Sure. If I may take my break, Your Honor, very quickly. I think what we're referring to is the regulation. And I think the regulation says you have various considerations, including safety. That's correct. But there's also the – looking at excerpt of record, page 213, lines 17 through 21, sets forth the – Which park – which edition of the park standards is this? That's the 1984 edition of the park road standards. Okay. And I'm sorry. And what's your – what's your page site? My page site is 213, 17 through 21. I have a 113. What page – is there a page? It's page 213, Your Honor. Okay. Is there – what's the page of the – Excerpt. Not of the excerpt, but of the standards themselves. Page number on it? I don't have that directly in front of me, Your Honor. I apologize. Does it say site distance, stopping site? Exactly. It says the plans for the construction of the road – it sets forth here – state that the radius for the center line of the road is 388.45 feet. The radius is consistent with the 35-mile-per-hour design speed as adopted in the 1984 edition of the park road standards, provided that the site distance meets or exceeds 225 feet, the minimum stopping site allowed for a 35-mile-per-hour design. As it sets forth here, the nearly vertical upward side slope for the westerly road direction significantly reduces the site distance, however, to 180 feet based on the Caltrans highway design charts, which are set forth in Excerpt of Record 213, 22 through 24. Basically, the simple fact is that under the park road standards 1984 edition, the maximum speed for this road simply was unsafe. And it was mandated. And even if it wasn't mandated, slowing down the speed simply is not the type of public policy decision that should be subject to discretionary immunity. It's simply there's no countervailing public policy consideration. As far as I can tell, perhaps my opposing party will disagree. Secondly, as to the – our other claim was that there should have been a warning sign setting forth that turns such as the one the van was making on the road into the vista point should not be made at this location. Even though they're technically legal under California law, having a vehicle make this turn places the danger of exactly what happened, somebody coming out of the tunnel, coming up upon a vehicle stopped in the road and having to swerve to avoid that vehicle. Well, this is a national park, and I think the jurisprudence is that in national parks there is, at least to some aspects, even relating to safety, there's some discretion, and particularly with placement of signs. And so what you might expect out on the open highways or on a curvy mountain road outside a national park may be different. Would you agree with that? Absolutely. Okay, so does the service then have some discretion? It has to exercise balancing aesthetics and how many signs are going to put along a road. I think that's correct, except in this case, I think this road is similar to the road that's set forth in the Cope case. The Cope case, which is the only case cited by either party which relates to a road, an actual road running through a state park. There's lots of cases citing the trail, citing other things. The Cope case sets forth that this was a similar road. It was formerly a road that was one for scenic driving but has really become a road for a highway running through the park. And I think in light of the changed nature of the road, that the sign placement is simply a matter of safety. And it's not a discretionary act. There's simply no warnings about this, that there's less warnings in a federal park than there is in the regular road. And I think they could simply solve this by putting one warning at the specific spot. Well, what about the other spots? I mean, you're saying that spot. You're focused on a spot. But we don't know in Yosemite how many spots there are that could be said to present some form of hazard, correct? That's correct, Your Honor. And that's certainly something that would be relevant. That's correct, Your Honor, and my time is up. Well, actually, I think this was the 20, was it not? You can keep a little bit. Okay. We'll push it to 15 for now. Is there any evidence in your record about accidents in that area? Yes, there is. In fact, Yosemite itself conducted two studies which found that this specific area of the road was a high-accident road. It was higher accident than most other areas in the park and much higher than the national average. And basically, what the argument of the government is that we have the discretion not to fix this road, not to lower the speed limit, not to post any signs, to leave this dangerous situation without any warning whatsoever to people on the road or to lower the speed limit to a safe level because there is this, there are these vaguer standards in the Park Roads Manual. And I think the question then comes back to whether or not, basically, whether or not the standards set forth in the Park Roads Standard as to the minimum speed, which it admits in some cases may not be attainable. When it is attainable in a situation like this by simply lowering the speed limit, does the government have the duty to do that? I submit that I think it does. Tell me, where are the 35-mile signs posted? Your Honor, there's no evidence of that in the record, unfortunately. It doesn't say where the 35-mile per hour signs are posted, but they're definitely posted throughout the park. In addition, the Park Roads Standard books produced by the government in discovery in this matter sets forth that the park roads are the type that are designed to be driven at a leisurely pace with enjoyment throughout the park. Simply lowering the speed limit to a safe speed, considering the conditions of the road, seems like there's no countervailing public policy against it. Additionally, the road... This isn't a situation where, like in Matisse, where they set up a road with redwood barriers, which is more for beauty.  By simply lowering the speed to a safe and reasonable level. Turning back to the defective warning issue, looking at the... I also think that in the warning issue, there's a matter that needs to be considered, which is the public's expectations of warnings on highways. Counsel, this is not a highway. That's the problem. The question is whether or not this is being treated like a highway. You're analogizing to Cope. How many vehicles per day travel this highway in Yosemite? Well, according to the records produced by the government, it's jammed, basically, during the summer season. That's jammed. We've got jammed coming down from San Francisco. I get jammed in Los Angeles. And I can get jammed in Sacramento. But it's all relative. There's no evidence in the record of that, Your Honor. Because in Cope, it was a commuter road, right? Well, no, it wasn't a commuter road. It had become a commuter road. That's what I'm asking. But that was the analogy. That's the case you are analogizing to. So I'm trying to get a... What does the evidence show this road is in Yosemite? It may get jammed during the summer, but during the rest of the year, it's lightly traveled or whatever. What is the traffic volume on this road? According to the government's own study, it's used as a high-speed highway to the park's other attractions. You're not answering my question. What's the volume of traffic? Is there any evidence? There's no evidence. Okay, that's what I was asking. And with that, I'll reserve the rest of my time. Okay, fine. Thank you. Thank you. Good morning. May it please the Court. Christy Capitan on behalf of the respondent, the United States of America. I could start by addressing some of the issues that he raised, but the first issue I would like to bring up, if it's all right with the Court, is the lack of evidence on the maintenance issue regarding the condition of the road on the date that the accident occurred. As this Court is well aware, the standard under Celotex, Matsushista, and Anderson v. Liberty Lobby is clear that once the government puts forth some evidence, the burden then shifts to the other side to produce evidence in rebuttal. And I would submit that they have not submitted any evidence concerning the condition of the roadway in terms of maintenance on the date in question. Is signage part of maintenance? I don't agree that signage is part of maintenance. I don't think that any of the Court's cases on signage have referred to signage as a maintenance issue. I am aware of a very recent decision by this Court, Oberson, Yes. which concerns speed limits on a snowmobile area in a national park. Snowmobiles that apparently go 60 miles an hour or more. Right. Interesting. I had no idea that snowmobiles could travel quite so rapidly. But in that case, the Court, interestingly enough, did address speed limits and specifically stated that setting of speed limits is subject to discretion. Was that their holding or was that just a stray dictum that may have crept into the It was a statement. It was a statement. Whether it was necessary to the holding of the Court is perhaps another question. But that was I noted the same thing. I would like it to be a statement of the Court, but I can't say that it is exactly what is precisely stated in the holding of Oberson, no. As I read the cases, we don't require an old road built many years ago to be modified. But we do require the Park Service to give appropriate attention to safety. And it would seem that, okay, you don't have to rebuild the road. You can have it as windy as you want. But that in regard to safety, do you not have to give some attention to how fast the cars should be allowed to track that area? Absolutely. I agree that safety is one of the factors that need to be considered. Under the discretionary function analysis, obviously the first prong is mandatory duty. I think here we can all agree there is not a mandatory duty as to setting up speed limits. I'm not sure that counsel agrees with that because he cited the Park Service standards. So why is that not a mandatory duty? Because the Park Road standards were adopted in the ones he is citing were adopted in 1984. This road was built in 1940. It was completed in 1940. The standards he's referencing were not in existence at the time this road was built. So if it's demonstrably unsafe to set a 35-mile-an-hour speed limit, the United States position is we don't have to adhere to that in any road built before that knowledge became available to us. I would submit that that's correct. There are other considerations regarding the setting of a speed limit that in addition to safety. First of all, this is a very long road in the park. This isn't short. You enter the entrance station and you're in the valley. This is over 30 miles long, and that is contained in the record, how long the road is contained in the study, the historic engineering study, which is Exhibit A to the Shields Declaration, which they have in there. It talks about the length of the road. It is a long road. Secondly, it does have significant amount of traffic during certain times of the year, not as significant as the urban parkway in Culp, but significant nonetheless. If we have a speed limit of 25 on a road that's 30 or more miles long. Whoa, whoa, whoa, wait a minute, wait a minute. How many highways, blue-line highways, have you gone through that reduce speed limits and then increase speed limits wherever it's appropriate? We're not talking about one speed limit for the entire 30 miles. But the road is extremely windy. There are many, many scenic turnouts. I've driven through the Sequoias, slow to 25, blind curve or sharp curve, all the little wiggly signs that as you enter Yosemite or you enter the Sequoia National Park, which is just south, plenty of signage on dangerous intersections. So why aren't we properly focused on whether there was some policy or some mandate with regard to a situation that occurs on the 30-mile road? You're suggesting that coming out of a tunnel into a blind curve created by the, we'll take the vegetation out of it, created by a granite wall to the right, as I understand it, where you have come around a blind curve and there's a stopping point, perhaps what would be viewed as a natural view point, and there's no consideration given to the miles per hour that's safe, even if, on your assumption, that the 1984 standard would say, if this were being built today, you'd have to have a lower speed limit, but you don't have to because it's already there? First, I'm not saying that that's what the park road standards say. Even if you take out the vegetation, I do not agree that the park road standards say that this turn has to be at 25 miles an hour. I do not concede that point. Why? Because I don't think that that's what the park road standards say. They begin on page 84 in the excerpts of record, and the excerpts as to the radius of curve are at the very end of the standards. I'm sorry I don't have the page citation for that, but it is at the end, and I would not agree that it sets that it has to be 25 miles per hour. Also, in his deposition testimony, which is also part of the record, this turn is not immediately after a tunnel. It took him five minutes to get to the curve when he came out of the tunnel. He said it was only a minute, but I guess that's a figure of speech. Right. I think he said it was a while, and he said it was a minute. This was a road he had traveled over 20 times, so it wasn't something he had never seen before. It's not that he didn't know that curves were on the road or were there. Of course, that's maybe a different issue. Yeah, I agree. That's a factual issue. That doesn't necessarily apply to the defense that I made. Yeah, he may lose because of familiarity with the road and a lot of other things, but that's not what's before us. If I do not agree, there's an answer I'd call. For me, at least, this comes down to the miles per hour. I'm trying to understand reading through the panoply of cases that go from you can have a case that says it's okay for the park service not to put a sign on a bridge that's dangerous where you might fall off the bridge, but it's okay not to put it or you must put a sign by a waterfall. I mean, we've got cases going all over the map in this complex, and the cases have recognized the discretionary function exception to be kind of loosey-goosey. They give with one hand and they take away. So just boil it down. Here we have a situation where there is a windy road, tunnels, viewpoints, heavy traffic, light traffic, depending on what time of season, what time of day, whatever, and generally a mountain winding road has got hazards inherent in it. So what's the policy that lies behind setting a speed limit? You can decide where to put the road. You can decide you're going to intrude upon nature by building this road. You're going to decide to make it two lanes or three lanes or whatever. The park service decides balancing the competing interests of what kind of usage, what kind of intrusion on nature and the like.  What is the policy involved in deciding that it should be a 35-mile-an-hour speed limit, which objective evidence would say is too high, we'll assume, that there is evidence that that's objectively too high a speed for the segment of the road that's at issue, as opposed to the 35 that the park service decides to put on it? And setting aside Oberson's statement that that would obviously be a matter of policy, what is the policy choice when you're deciding what speed limit to set? So now we're going to the second prong of the question. Yeah, if we're going to move beyond mandatory, it's not mandatory. We'll assume there's a policy then, or even if there's policy. Well, there clearly seems to be some policy which suggests that speed limits are part of the responsibility. The question is what policy choices are being made? One, as you've already discussed and as Council has brought up before, this is a road that carries heavy loads of traffic certain times of year, other times it may not. There are issues of congestion. Yosemite Valley is subject to lots of pollution now due to increased road traffic. The slower cars go, the more they're going to emit. That's a policy decision. Enhancing visitor enjoyment. Driving 25 miles an hour for a long period of time may not so much enhance visitor enjoyment. Yes, it's pretty and they may be missing some of the view, but the valley is also beautiful and people tend to want to get there. So the park manager is balancing those considerations as well, including the amount of risk. How much of a risk is it? In Oberson, they did studies and they had warranted the road at a certain speed. Now here, what is the evidence in the record about accidents in this area? The evidence on accidents, in my opinion, isn't admissible evidence. It's contained in a declaration by an expert that was done in a report under Rule 26. Now, I know that experts can rely on hearsay under the federal rules of evidence, but that does not make the evidence that's being submitted admissible for the purpose. Now, was this a study done by the Park Service? Were some of the studies done by the Park Service? Yes. On all the roads in Yosemite Park, by the way, not just this road. And we don't have copies of those studies. They're not part of the record. It's just a hearsay statement by the expert in this case. Was it objected to? Yes, it was objected to, and the objections are contained in the record as well. So I would submit that it's the evidence. What is the information to respond to Judge Fletcher's question? I'm sorry, I apologize. No, I mean, we got interrupted. I want to make sure we complete the answer. Can I do two? Absolutely. What is the accident record on this part of the highway? It's not a specific, if I may step back. Please. The Sheo's report begins on excerpts of Record 161, and he discusses the reports on excerpts of Record 162. And what he's discussing in the record is the National Park Service contracted with Kenley Horn and Associates to prepare a traffic engineering study, and it says it has an accident density of 10 accidents per mile on the whole road, which is a high-accident roadway segment. The report didn't recommend any specific improvements. Another study by Robert Peccia also says it's a high-accident road segment, and it did not recommend any specific improvements. And the reason I'm bringing that up is, to me, that distinguishes it from some of the cases in which specific improvements were recommended and the Park Service didn't follow, such as Summers, arguably, such as Oberon, which would show that something had been recommended. And to me, that goes into the design versus implementation distinction of the exception. In some ways, when you asked if speed limits were designed, in some ways it is a design more than a maintenance issue to me, and I think Council agreed with that as well. So there's no specific data about the number of accidents on the road, and even these independent people that Yosemite Valley paid to study their roads didn't recommend any specific changes be made to the road or to the speed limit in those reports. Are there questions for me? No. Not right now? Okay. I would submit that since you're focusing pretty much on the speed limit, I'm not going to waste a lot of time talking about the other issues. I would submit that the maintenance issue is covered by the Celotex argument. There's no admissible evidence regarding the condition of the roadway on the date in question, that the discretionary function exception clearly applies to the design of Big Oak Flat Road and the standards as adopted in the 80s, and even 68. There are some park road standards of 68 would not apply to this road. There have been no rehabilitation reconstruction projects completed or even begun on this road, which is, by the way, in the National Registry of Historic Places, so it would take a lot to change the road. I don't think we're any of us suggesting that the duty was to change the road. I think you're suggesting that the duty was to change the speed limit. Yes. And my response to that would be that it is up to the park manager taking into account all of the factors that go into running a national park that would decide whether or not the park. You cited congestion and pollution. I haven't heard any other consideration that would go into a speed limit. Visitor access, getting visitors into the park and to various areas of the park. Is there any evidence that that was at all involved here, visitor access? Well, the access, it's one of two entrances to the park, and it's only two entrances to the park. Therefore, it would necessarily encompass visitor access. Is there anything in the record as to whether the responsible ranger or whoever had thought all these things through and said, well, it's more important to keep congestion down. We'll have a few accidents, but that's okay. I would submit that under Gobert, we're not required to actually have evidence that we engaged in a policy analysis. It's whether or not the decision to be made is subject to a policy analysis. So then you can just bring up all of the reasons which might possibly affect a policy decision, not require that anybody really have considered them. I don't think that that's what's required by the Supreme Court precedent. I do not agree that it's required that you show we actually engaged in policy weighing. In fact, I would submit that Gobert specifically says you do not have to have evidence that a policy analysis was actually undertaken by the park. Maybe not, but there has to be some articulation of policy rationale that would support it. Otherwise, how is a court supposed to determine whether or not it's an area that we're supposed to stay out of? All those cases talk about sort of what was going on and there was a rationale for why it was going on to justify that it contained some policy element. So what's the evidence other than you're just saying we can pick from the Christmas tree that has all sorts of policy applications in a national park? How does that translate down to speed limit? Where's the policy there? You're saying, well, access, but my reaction to access is that's true. And one accident will create a backlog all the way to the entrance to the park. If you have people spinning out of control or having accidents on a blind curve, that sort of doesn't – access sort of seems to cancel itself out. But there's no evidence in the record about the number of accidents or how many accidents or exactly where on the segment of roadway the accidents have occurred. Well, that's true. But just, you know, common sense. There has to be a certain amount of common sense applied to the discrete decision that's being challenged here. And if we narrow it all down to the speed limit, I think we're entitled to consider what policy choices reasonably could be involved. And you're saying – and you've given us the list and you're giving us the reasons. And I think that that's a good articulation of reasons. And I would also like to make the point, which I know the court is very well aware, that the purpose of the exception is to avoid courts managing parks. Second-guessing. Exactly. And once you start setting speed limits here, perhaps another road on the other entrance to the park, perhaps this court or another court would think that maybe that speed limit is wrong because there's a few more accidents there. Well, that's sort of objectively provable, I think. This is not the – I mean, I think given the fact that even in the snowmobile case, one could make a determination on the facts of the case and the condition that was there that the government ought to be answerable in tort to justify why it is letting things happen rather than simply too bad courts stay out. That's what's at issue here is not that you're necessarily going to be – the government's necessarily be held liable, but they're going to have to defend it under normal tort standards. And I would submit that if this court goes that far, this court has never gone that far in this analysis. In all of the other cases, the Park Service has actually either taken a step to do something, to change something, and then hasn't done it or hasn't followed their established safety guidelines or set a speed limit, then changed the road completely and kept the speed limit at 45. Now what you're saying is we're doing nothing, but we can decide today that now the road's too fast. That's a big jump for this court, I would submit, and for the jurisprudence on the discretionary function exception. Well, we are courageous, but maybe not. Thank you very much. Thank you. Thank you. I would like to address one main issue that my co-counsel, the other counsel raised. The government. The government raised. They said that this road was built in 1940, and there's no dispute that this road was built in 1940. Admittedly, these park road standards were put into effect later, but we're not saying redesign the road, but if the park road standards say that this speed limit for this type of turn should be 25 miles per hour. Well, where does it exactly say that? I don't find in the park standards they say it must be. It says that's an objective, but the manual itself or the park standard itself says this is not mandated on them. It recognizes that the park conditions are going to be variable. So is it your argument that the park standard is an absolute mandate, much like in the polio vaccine case that the National Institutes of Health could not have no discretion whatsoever. They were mandated that they had to check the live vaccine before they could issue it. So what you're saying that that's what we should assume here. I'm saying that when it is practical as it is in this case, the government should have to live up to that standard. Simply lowering the speed limit. The government should simply should be held to the standards they set forth in their own manual. OK. And so you said practical. Now, what if the response of the government as it is, is that they have to make some decisions to decide whether they should slow the speed down to a crawl at 25 miles an hour, which is like a school zone on a fairly busy highway in this particular section. Do you disagree with counsel's argument that their congestion and pollution and visitor accessibility are factors that they'd have to take into account? I understand that those are factors they would have to take into account. But I think those factors are simply overcome by the fact that this road was unsafe. They put an unsafe road out there in the design of the way it was, that there simply was insufficient time to slow it. I think, you know, this combined with the fact that they provided no warning of this danger, of this blind curve and didn't slow the speed limit down. I think the government should have to answer for that. I think this is not the type of public policy. Should we make a treaty? Should we, you know, what should the standards of polio vaccines be under the law? These are not grand public policy questions. This is building a safe road for the citizens of the United States. Thank you. Thank you. Counsel, we thank you both for your arguments. Very interesting case. The case argued is submitted.
judges: Goodwin, B. Fletcher, Fisher